## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ELIZABETH MOELLER and NICOLE BRISSON, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>AMERICAN MEDIA, INC., a Delaware corporation, and ODYSSEY MAGAZINE PUBLISHING GROUP, INC., a Delaware corporation,<br><br>     Defendants. | Case No.: 2:16-cv-11367<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Elizabeth Moeller and Nicole Brisson bring this Class Action Complaint and Demand for Jury Trial against Defendants American Media, Inc. and Odyssey Magazine Publishing Group, Inc. to obtain redress for all persons injured by their intentional and unlawful disclosure of Plaintiffs' and a proposed Class of consumers' sensitive and statutorily protected information. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by their attorneys:

### NATURE OF THE CASE

1. Defendant American Media, Inc. is an International media company that publishes some of the most widely circulated magazines in the United States,

including *National Enquirer*, *Star*, *Muscle & Fitness*, and *Flex*. Defendant

Odyssey Magazine Publishing Group, Inc. is a wholly owned subsidiary of

American Media that publishes *OK!* magazine.

2.    Unfortunately, Defendants supplement their sales and advertising

revenues by secretly selling their subscribers' statutorily protected information—

including their full names, the title of the magazines they subscribed to, and home

addresses (collectively "Personal Reading Information")—to data miners and other

unrelated third party companies. Defendants also trade their subscribers' Personal

Reading Information with other data miners and aggregators for the purpose of

"appending" (*i.e.*, supplementing) their customer files with other highly sensitive

data about them, such as their age, gender, ethnicity, income level, and other

lifestyle information. By enhancing their customers' Personal Reading Information

in this way, Defendants are able to increase the "street value" of their customer

lists and sell or trade them at higher premiums.

3.    In order to facilitate their surreptitious multi-million dollar disclosure

business, Defendants hide their practices from their subscribers, and neither

notifies them nor obtains their permission before disclosing their Personal Reading

Information to unrelated third parties.

4.    Defendants' disclosure practices squarely violate Michigan's

Preservation of Personal Privacy Act, M.C.L. §§ 445.1711–15—a broad consumer

protection statute popularly referred to as the Video Rental Privacy Act ("PPPA"). The PPPA prohibits companies like Defendants from disclosing—without written permission—any information that specifically identifies a person as having purchased written materials, such as magazines.

5.      Accordingly, Plaintiffs Moeller and Brisson bring this Complaint against Defendants for their intentional and unlawful disclosure of their subscribers' Personal Reading Information in violation of the PPPA, and for unjust enrichment from such practices.

## PARTIES

6.      Plaintiff Elizabeth Moeller is a natural person and citizen of the State of Michigan.

7.      Plaintiff Nicole Brisson is a natural person and citizen of the State of Michigan.

8.      Defendant American Media, Inc., is a Delaware corporation with its principal place of business located at 4 New York Plaza, New York, New York 10004. Defendant American Media conducts business throughout this District, the State of Michigan, and the United States.

9.      Defendant Odyssey Magazine Publishing Group, Inc., is a Delaware corporation with its principal place of business located at 4 New York Plaza, New York, New York 10004. Defendant Odyssey is a wholly owned subsidiary of

Defendant America Media. Defendant Odyssey conducts business throughout this District, the State of Michigan, and the United States.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because at least one Class member is a citizen of a State different than Defendants, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

11.     This Court has personal jurisdiction over Defendants because they regularly conduct business in this District, including by soliciting business from, and entering into transactions with, consumers located in this District. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from this District.

12.      Venue is proper in this District under 28 U.S.C. § 1391 because, a substantial part of the events giving rise to Plaintiffs' claims took place within this District. Venue is additionally proper because Defendants conduct significant business in this District, including soliciting consumer business and entering into consumer transactions here and Plaintiff Moeller resides within this District.

## FACTUAL BACKGROUND

### I. An Overview of Michigan's Preservation of Personal Privacy Act.

13. In 1988, after the public disclosure of then-Supreme Court nominee Robert Bork's (and his family's) video viewing records, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into [their] loves, likes, and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

14. Congress responded by passing the federal Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA")—which, as enacted, regulates a certain type of business (a "video tape service provider") and a narrow subset of consumer information (that is, "information which identifies a person as having requested or obtained specific video materials or services"). Although this statute initially also sought to "protect[] the selection of books that [consumers] read," 134 Cong. Rec. S5399 (May 10, 1988), the final version of the VPPA was limited to video materials. *See* 18 U.S.C. § 2710.

15. The Michigan Legislature, however, decided that the federal VPPA didn't go far enough, and expressed concern that Michigan consumers' "choice[s]

in reading, music, and video entertainment [were] a private matter, and not fit for

consideration by gossipy publications, employers, clubs, or anyone else." H.B. No.

5331 (Jan. 20, 1989).

16.     As a result, in 1989, the PPPA was enacted "to preserve personal

privacy with respect to the purchase, rental, or borrowing of certain materials[,]"

including written materials such as books and magazines. M.C.L. Ch. 445. The

PPPA therefore provides, in relevant part, that:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting,
> or lending books or other written materials . . . *shall
> not disclose* to any person, other than the customer, a
> record or information concerning the purchase . . . of
> those materials by a customer that indicates the identity
> of the customer.

M.C.L. § 445.1712 (emphasis added).

17.     As such, and in comparison to its more limited federal analogue, the

Michigan PPPA expressly regulates a broader set of businesses (those engaged in,

among other things, "the business of selling at retail . . . written materials") and

protects a wider array of consumer information (*i.e.*, any "record or information

concerning the purchase, rental, or borrowing of those materials by a customer that

indicates the identity of the customer"). *Compare* 18 U.S.C. § 2710 *with* M.C.L. §

445.1712.

## II.   Consumers' Personal Information Has Real Value.

18.   In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . and individuals are concerned about being defined by the existing data on themselves."[1]

19.   More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

20.   The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit*.[3]

---

[1]   *The Information Marketplace: Merging and Exchanging Consumer Data*, Federal Trade Commission, 8, 11 (Mar. 13, 2001), *available at* http://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last accessed April 14, 2016).

[2]   *See* Julia Angwin & Emily Steel, *Web's Hot New Commodity: Privacy*, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274 .html (last visited April 14, 2016).

[3]   Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable*, Federal Trade Commission, 2 (Dec. 7, 2009), *available at* http://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-

21.    In fact, an entire industry exists where companies known as data miners purchase, trade, and otherwise collect massive databases of information about consumers. Data miners then profit by selling this "extraordinarily intrusive" information in an open and largely unregulated market.[4]

22.    The scope of data miners' knowledge of consumers' private information is immense: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

23.    Recognizing the serious threat the data mining industry poses to consumers' privacy, the Co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent letters to nine major data brokerage companies seeking information on how those companies compile, store, and sell their massive collections of

---

exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed April 14, 2016) (emphasis added).

[4]    *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited April 14, 2016).

[5]    Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, The New York Times (June 16, 2012), http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited April 14, 2016).

consumer data.[6] In their letters, the Co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on almost every U.S. consumer.* This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[7]

24.    Unfortunately, magazine publishers (like Defendants) commonly engage in these practices by participating in "database cooperatives," where publishers can engage in the *quid pro quo* swapping of access to their respective customer lists that, by its nature, involves the disclosure of customers' Personal Reading Information.

25.    Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[6]    *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Senator Ed Markey, http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited April 14, 2016).

[7]    *See*, *e.g.*, Letter from Edward J. Markey and Joe Barton, Co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 2, 2012), *available at* http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (last accessed April 14, 2016) (emphasis added).

**III.   Defendants Unlawfully Disclose Their Subscribers' Personal Reading Information.**

26.     Defendants maintain a vast digital database comprised of their subscribers' Personal Reading Information.

27.     This, in turn, allows Defendants to amass highly detailed customer lists—sorted by, among other things, their subscribers' specific reading habits (*i.e.*, the specific magazine they've purchased and subscribed to) and demographic details (including the sensitive information described above that Defendants have obtained from data miners)—which they can then sell and otherwise disclose at a higher premium to interested third parties.

28.     Unfortunately, Defendants actively conceal these invasive data disclosure practices from their subscribers. In fact, Defendants fail to obtain any form of consent from—or even provide effective notice to—their subscribers before disclosing their Personal Reading Information to third parties.

29.     By and through these actions, Defendants not only disregard their subscribers' privacy, they also violate the PPPA.

### FACTS RELATING TO ELIZABETH MOELLER

30.     Plaintiff Elizabeth Moeller is a citizen of the State of Michigan.

31.     Moeller subscribes to Defendants' *OK!* and *National Enquirer* magazines. She purchased her subscription to *OK!* magazine directly from Defendant Odyssey by completing one of its renewal notification postcards in or

around 2010, and has continued to renew annually since. She purchased her subscription to *National Enquirer* magazine directly from Defendant American Media by calling its toll free telephone number, and has continued to renew annually since.

32.     *OK!* and *National Enquirer* are magazines published, owned, and operated by Defendants.

33.     Moeller has never agreed in writing or otherwise to allow Defendants to sell or disclose her Personal Reading Information to any unrelated third parties.

34.     Moeller did not receive notice of such disclosures before Defendants disclosed her Personal Reading Information to unrelated third parties.

35.     Defendants have disclosed, and continue to disclose, Moeller's Personal Reading Information (*i.e.*, information that identifies Moeller as having purchased subscriptions to *OK!* and *National Enquirer*)—without obtaining her permission or providing prior notice—to data mining companies, who append the information with data from their own records.

36.     During this same time period, Defendants have also disclosed—and continue to disclose—Moeller's Personal Reading Information to other unrelated third party companies, including so-called "database cooperatives" without first obtaining her consent or giving her prior notice of the disclosures.

37.     These disclosures to unrelated third party companies squarely violate the PPPA.

38.     Further, and even though they lacked permission to even disclose her Personal Reading Information in the first place, Defendants profited from their unlawful disclosures of Moeller's Personal Reading Information.

39.     Ultimately, what Moeller received (subscriptions without privacy protections) was substantially less valuable than what she paid for (subscriptions with accompanying privacy protections). Had she known that Defendants would disclose her Personal Reading Information to third parties without her permission, Moeller would not have purchased her subscriptions. Thus, Moeller has suffered concrete economic harm in the form of the monies paid to Defendants in exchange for the magazine subscriptions.

## FACTS RELATING TO NICOLE BRISSON

40.     Plaintiff Nicole Brisson is a citizen of the State of Michigan.

41.     Brisson subscribes to the *National Enquirer* magazine. She purchased her subscription to *National Enquirer* directly from Defendant American Media by completing a postcard contained in a *National Enquirer* publication and sending it directly to Defendant American Media in or around 2014.

42.     *National Enquirer* is a magazine published, owned, and operated by

12

Defendant American Media.

43.     Brisson has never agreed in writing or otherwise to allow Defendants to sell or disclose her Personal Reading Information to any unrelated third parties.

44.     Brisson did not receive notice of such disclosures before Defendants disclosed her Personal Reading Information to unrelated third parties.

45.     Defendants have disclosed, and continue to disclose, Brisson's Personal Reading Information (*i.e.*, information that identifies Brisson as having purchased a subscription to *National Enquirer*)—without obtaining her permission or providing prior notice—to data mining companies, who append the information with data from their own records.

46.     During this same time period, Defendants have also disclosed—and continue to disclose—Brisson's Personal Reading Information to other unrelated third party companies, including so-called "database cooperatives" without first obtaining her consent or giving her prior notice of the disclosures.

47.     These disclosures to unrelated third party companies squarely violate the PPPA.

48.     Further, and even though they lacked permission to even disclose her Personal Reading Information in the first place, Defendants profited from their unlawful disclosures of Brisson's Personal Reading Information.

49.     Ultimately, what Brisson received (a subscription without privacy

13

protections) was substantially less valuable than what she paid for (a subscription with accompanying privacy protections). Had she known that Defendants would disclose her Personal Reading Information to third parties without her permission, Brisson would not have purchased her subscription. Thus, Brisson has suffered concrete economic harm in the form of the monies paid to Defendants in exchange for the magazine subscription.

## CLASS ACTION ALLEGATIONS

50.    **Class Definition**: Plaintiffs Moeller and Brisson bring this action on behalf of themselves and a proposed Class, defined as follows

> All Michigan residents who purchased subscriptions to Defendants' magazines.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

51.    **Numerosity**: The exact number of Class members is unknown to Plaintiffs at this time, but it is clear that individual joinder of each Class member is impracticable. Defendants have disclosed the Personal Reading Information of thousands of consumers who fall into the definition of the Class. Ultimately, members of the Class will be easily identified through Defendants' records.

52.    **Commonality and Predominance**: Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)    Whether Defendants are "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)    Whether Defendants obtained written permission before disclosing Plaintiffs' and the Class's Personal Reading Information to third parties;

(c)    Whether Defendants' disclosure of Plaintiffs' and the Class's Personal Reading Information violated the PPPA; and

(d)    Whether Defendants were unjustly enriched through their conduct described herein.

53.    **Typicality**: Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs and the Class sustained damages as a result of Defendants' uniform wrongful conduct, based upon Defendants' disclosures of Plaintiffs' and the Class's Personal Reading Information.

54.    **Adequate Representation**: Plaintiffs will fairly and adequately

15

represent and protect the interests of the Class, and have retained counsel

competent and experienced in complex litigation and class actions. Plaintiffs have

no interests antagonistic to those of the Class, and Defendants have no defenses

unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously

prosecuting this action on behalf of the Class members, and have the financial

resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to

those of the other Class members.

55.   **Policies Generally Applicable to the Class**: This class action is

appropriate for certification because Defendants have acted or refused to act on

grounds generally applicable to the Class as a whole, thereby requiring the Court's

imposition of uniform relief to ensure compatible standards of conduct toward the

Class members, and making final injunctive relief appropriate with respect to the

Class as a whole. Defendants' practices challenged herein apply to and affect the

Class members uniformly, and Plaintiffs' challenge of those practices hinges on

Defendants' conduct with respect to the Class as a whole, not on facts or law

applicable only to Plaintiffs.

56.   **Superiority**: Class proceedings are superior to all other available

methods for the fair and efficient adjudication of this controversy, as joinder of all

Class members is impracticable. The damages suffered by the individual Class

members will likely be small relative to the burden and expense of individual

16

prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendants' misconduct on an individual basis. Even if Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

57.     Plaintiffs reserve the right to revise the definition of the Class as necessary based upon information learned in discovery.

### FIRST CAUSE OF ACTION
### Violation of M.C.L. § 445.1712
### (On Behalf of Plaintiffs and the Class)

58.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

59.     As magazine publishers that sell subscriptions directly to consumers, Defendants are engaged in the business of selling written materials at retail. *See* M.C.L. § 445.1712.

60.     By purchasing subscriptions to the *National Enquirer* and *OK!*

17

magazines, Plaintiffs purchased written materials directly from Defendants. *See* M.C.L. § 445.1712.

61.    Because Plaintiffs purchased written materials directly from Defendants, they are "customers" within the meaning of the PPPA. *See* M.C.L. § 445.1711(a).

62.    At all times relevant, and beginning on the dates Plaintiffs first purchased subscriptions to *National Enquirer* and *OK!*, Defendants disclosed—and continues to disclose—Plaintiffs' Personal Reading Information, which identified them as *National Enquirer* and *OK!* subscribers, in at least two ways.

63.    First, Defendants disclosed customer lists containing Plaintiffs' Personal Reading Information to data mining companies (including Insource) who then supplemented the lists with additional sensitive information from their own databases.

64.    Second, Defendants disclosed customer lists containing Plaintiffs' Personal Reading Information to other third party companies who, in turn, sold and/or disclose those lists (or access to those lists) to a number of other parties—including other magazine publishers.

65.    By disclosing their customer lists, Defendants disclosed to persons other than Plaintiffs, records or information concerning their purchases of written materials from Defendants. *See* M.C.L. § 445.1712.

66.     Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Defendants were able to increase their profits gained from the mailing list sales.

67.     The information Defendants disclosed indicates Plaintiffs' names and addresses, as well as the fact that they subscribed to the *National Enquirer* and *OK!* magazines. Accordingly, the records or information disclosed by Defendants indicate Plaintiffs' identities. *See* M.C.L.§ 445.1712.

68.     Plaintiffs and the members of the Class never provided Defendants with consent to disclose their Personal Reading Information to anyone.

69.     Worse yet, Plaintiffs and the members of the Class did not receive any prior notice before Defendants disclosed their Personal Reading Information to third parties.

70.     On information and belief, Defendants' disclosures of Plaintiffs' and the Class's Personal Reading Information were not made pursuant to a court order, search warrant, or grand jury subpoena.

71.     Defendants' disclosures of Plaintiffs' and the Class's Personal Reading Information were not made to collect payment for their subscriptions.

72.     Defendants' disclosures of Plaintiffs' Personal Reading Information were made to third parties, including data miners and database cooperatives, in order to increase Defendants' revenue and ability to prospectively market their

own products—*i.e.*, subscriptions to their magazines—to the subscribers of *other* publications (among other reasons). Accordingly, Defendants' disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiffs and the members of the Class.

73.    By disclosing Plaintiffs' and the Class's Personal Reading Information, Defendants violated their statutorily-protected rights to privacy in their reading habits. *See* M.C.L. § 445.1712.

74.    Additionally, because Plaintiffs and the members of the Class paid money to Defendants for their subscriptions to Defendants' magazines, and Defendants were obligated to comply with the PPPA, Defendants' unlawful disclosure of Plaintiffs' and the other members of the Class's Personal Reading Information deprived Plaintiffs and the members of the Class the full value of their paid-for subscriptions. As such, and also because Plaintiffs and the other members of the Class ascribe monetary value to the privacy of their Personal Reading Information, Defendants' unlawful sale and disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

75.    Likewise, because Plaintiffs and the other members of the Class ascribe monetary value to the privacy of their Personal Reading Information, a magazine subscription that keeps their Personal Reading Information private is

more valuable than one that does not.

76.    Accordingly, had Plaintiffs known of Defendants' surreptitious disclosure practices at or before the time of their purchases, they would not have purchased their *National Enquirer* and *OK!* subscriptions. Thus, Defendants' unlawful disclosures caused Plaintiffs economic harm in the form of the purchase price of the magazine subscriptions.

77.    As described herein, Defendants generate substantial revenue by disclosing Plaintiffs' and the Class's Personal Reading Information to data miners and other unrelated third parties.

78.    As a result of Defendants' unlawful and continued disclosure of their Personal Reading Information, Plaintiffs and the members of the Class have suffered privacy and economic injuries. On behalf of themselves and the Class, Plaintiffs seek: (1) an injunction prohibiting Defendants from disclosing Plaintiffs and the Class's Personal Reading Information without first obtaining their written permission (*i.e.*, as required by the PPPA); (2) actual damages, including disgorgement, or $5,000.00, whichever is greater, per member of the Class, pursuant to M.C.L. § 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

## SECOND CAUSE OF ACTION
### Unjust Enrichment
### (On Behalf of Plaintiffs and the Class)

79.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

80.     Plaintiffs and the members of the Class conferred benefits on Defendants by providing Defendants with their Personal Reading Information and paying Defendants for their magazine subscriptions. Defendants received and retained the information and money belonging to Plaintiffs and the Class when they purchased their subscriptions to Defendants' publications.

81.     Because Defendants received and processed Plaintiffs' and the Class's subscription payments and Personal Reading Information, and because Defendants processes and fulfills the subscriptions and discloses Plaintiffs' and the Class's Personal Reading Information to third parties, Defendants appreciate and/or have knowledge of such benefits.

82.     Under the PPPA, Plaintiffs and the members of the Class were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

83.     Under principles of equity and good conscience, because Defendants failed to comply with the PPPA, Defendants should not be allowed to retain the full amount of money Plaintiffs and the Class paid for their subscriptions or the

money they received by selling Plaintiffs' and the Class's Personal Reading Information.

84.    Plaintiffs and the other members of the Class have suffered actual damages as a result of Defendants' unlawful conduct in the form of monies paid for their magazine subscriptions, which they wouldn't have purchased had they known of Defendants' unlawful disclosure practices.

85.    To prevent inequity, Defendants should return to Plaintiffs and the Class all monies they paid for their magazine subscriptions, and disgorge any profits derived from the disclosures at issue.

86.    Accordingly, on behalf of themselves and the Class, seek an order declaring that Defendants' conduct constitutes unjust enrichment, and awarding Plaintiffs and the Class restitution in an amount equal to that which they paid to Defendants for their magazine subscriptions, as well as disgorgement of all profits derived by Defendants as a result of their unlawful disclosures of Plaintiffs' and the Class's Personal Reading Information.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Elizabeth Moeller and Nicole Brisson, on behalf of themselves and the Class, pray that the Court enter judgment in their favor and against Defendants, and for the following relief:

A.    For an order certifying the Class as defined above, appointing

Plaintiffs Moeller and Brisson as representatives of the Class, and designating their counsel as Class Counsel;

B.     For an order declaring that Defendants' conduct as described herein violates the PPPA;

C.     For an order declaring that Defendants were unjustly enriched as a result of their conduct described herein;

D.     For an award of actual damages, including disgorgement, or $5,000, whichever is greater, to Plaintiffs and each member of the Class, as provided by the PPPA;

E.     Award injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendants to cease the unlawful disclosures discussed herein;

F.     For an award of reasonable attorneys' fees and costs pursuant to M.C.L. § 445.1715(b); and

G.     Such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiffs requests trial by jury on all claims that can be so tried.

24

Respectfully submitted,

**ELIZABETH MOELLER** and **NICOLE BRISSON**, individually and on behalf of all others similarly situated,

Dated: April 14, 2016

By: /s/ Ari J. Scharg
     One of Plaintiffs' Attorneys

Ari J. Scharg
ascharg@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Henry M. Scharg (P28804)
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

Scott A. Bursor*
scott@bursor.com
Joseph I. Marchese*
jmarchese@bursor.com
Philip L. Fraietta*
pfraietta@bursor.com
BURSOR & FISHER, PA
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

*Admission to be sought.