## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ELIZABETH MOELLER and NICOLE BRISSON, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>AMERICAN MEDIA, INC., a Delaware corporation, and ODYSSEY MAGAZINE PUBLISHING GROUP, INC.,<br>a Delaware corporation,<br><br>          Defendants. | Case No. 2:16-cv-11367-JEL-EAS<br><br>[Hon. Judith E. Levy] |

## PLAINTIFFS' MOTION FOR AND BRIEF IN SUPPORT OF
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

**Respectfully submitted by:**

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com
Eve-Lynn Rapp
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: 248.596.1111
Fax: 248.671.0335

Scott A. Bursor
scott@bursor.com
Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, PA
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

*Counsel for the Plaintiffs and the Settlement Class*

**PLAINTIFFS' MOTION FOR**
**<u>FINAL APPROVAL OF CLASS ACTION SETTLEMENT</u>**

Plaintiffs Elizabeth Moeller and Nicole Brisson respectfully move the Court to grant their Motion for Final Approval of Class Action Settlement. Specifically, Plaintiffs request that the Court find that (i) the notice to the Settlement Class satisfies the requirement of Due Process and Rule 23, and (ii) the Settlement is fair, reasonable, and adequate meriting final approval. In accordance with Local Rule 7.1(a), counsel for Defendant will not oppose the relief sought by this motion. (*See* Parties' Class Action Settlement Agreement, ¶¶ 8.1, 8.3.)[1]

For the reasons discussed in the accompanying brief, the Motion should be granted.

---

[1] A copy of the Parties' Class Action Settlement Agreement is attached hereto as Exhibit 1.

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR**
**FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

**STATEMENT OF ISSUES PRESENTED**

1. Whether this Court should find that notice to the Settlement Class satisfies the requirements of Due Process and Federal Rule of Civil Procedure 23, when direct notice, detailing the terms of the Settlement Agreement and individual options for objecting, opting-out, or submitting a claim, was transmitted via email and postcard and reached 89.9% of the class?

   **Plaintiffs' Answer: Yes.**

2. Whether this Court should grant final approval to the Settlement Agreement under Michigan's Preservation of Personal Privacy Act, M.C.L. §§ 445.1711-1715 ("PPPA"), finding it fair, reasonable, and adequate, when it delivers meaningful prospective and monetary relief to the Settlement Class?

   **Plaintiffs' Answer: Yes.**

# CONTROLLING AND MOST IMPORTANT AUTHORITY

## UNITED STATES SUPREME COURT CASES:

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ...................................................................... 8

## UNITED STATES COURT OF APPEALS CASES:

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*,
    636 F.3d 235 (6th Cir. 2011) .................................................. 12, 13

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ................................................*passim*

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ............................... 10, 11, 17, 20, 21

## UNITED STATES DISTRICT COURT CASES:

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831 (E.D. Mich.  2015) ....................................... 14,
    16, 21

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D. Mich. 20032015).............................. 12, 16, 17, 18, 22

*Leonhardt v. ArvinMeritor, Inc.*,
    581 F. Supp. 2d 818 (E.D. Mich. 2008) ...............................*passim*

*UAW v. Gen. Motors Corp.*,
    2006 WL 891151 (E.D. Mich. Mar. 31, 2006)............................. 8

## OTHER AUTHORITIES:

Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process
Checklist and Plain Language Guide (2010) ............................ 9

Fed. R. Civ. P. 23 ............................................................... 8, 10

## TABLE OF CONTENTS

I.      INTRODUCTION ......................................................... 1

II.     BACKGROUND ......................................................... 2

        A. Plaintiff's Allegations ............................................ 2

        B. The Road to the Settlement Agreement ................................ 4

III.    TERMS OF THE SETTLEMENT AGREEMENT ................................. 6

        A. Class Definition. ................................................. 6

        B. Monetary Relief .................................................. 7

        C. Prospective Relief ................................................ 7

        D. Payment of notice and settlement administration expenses ................ 7

        E. Payment of incentive award, attorneys' fees, and expenses ............... 7

        F. Release ......................................................... 8

IV.     THE NOTICE PLAN COMPORTS WITH DUE PROCESS................ 8

V.      THE SETTLEMENT WARRANTS FINAL APPROVAL ..................... 10

        A. Plaintiffs' Likelihood of Success on the Merits, Balanced Against the
           Benefits of Settlement, Weighs in Favor of Final Approval. ............. 12

        B. In Protecting Reader Privacy and Conserving Judicial Resources,
           the Settlement Serves the Public Interest ............................ 16

        C. The Complexity, Expense, and Duration of Further Litigation Favors
           Final Approval ................................................... 18

        D. The Stage of the Proceedings and Amount of Discovery Completed
           Weigh in Favor of Final Approval .................................. 19

**E. The Opinion of Class Counsel Supports Final Approval** .................. 20

**F. The Reaction of Absent Class Members Favors Final Approval** ...... 22

**G. The Settlement is Free from Fraud and Collusion** ........................... 25

**VI.    CONCLUSION** ......................................................................... 27

# TABLE OF AUTHORITIES

## United States Supreme Court Cases

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ................................................................................ 8

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................... 4

*Stanley v. Georgia*,
    394 U.S. 557 (1969) .............................................................................. 17

## United States Court of Appeals Cases

*Coulter-Owens v. Time Inc.*,
    2017 WL 2731309 (6th Cir. June 26, 2017)............................................ 13

*Fidel v. Farley*,
    534 F.3d 508 (6th Cir. 2008) .................................................................. 9

*Gascho v. Glob. Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) .................................................................. 9

*Granada Invs., Inc. v. DWG Corp.*,
    962 F.2d 1203 (6th Cir. 1992) ................................................................ 11

*In re Gen. Tire & Rubber Co. Sec. Litig.*,
    726 F.2d 1075 (6th Cir. 1984) ................................................................ 13

*In re Pampers Dry Max Litig.*,
    724 F.3d 713 (6th Cir. 2013) .................................................................. 26

*Lane v. Facebook, Inc.*,
    696 F.3d 811 (9th Cir. 2012) .................................................................. 15

*Olden v. Gardner*,
    294 F. App'x 210 (6th Cir. 2008)............................................................ 23

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*,
    636 F.3d 235 (6th Cir. 2011) .................................................. 12, 13

*UAW v. Gen. Motors Corp.*,
    497 F.3d 615 (6th Cir. 2007) ............................................... *passim*

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) .............................. 10, 11, 17, 20, 21

**United States District Court Cases**

*Coulter-Owens v. Rodale, Inc.*,
    No. 14-cv-12688 (E.D. Mich. Sep. 29, 2016) ....................... 14, 21

*Dick v. Sprint Commc'ns Co. L.P.*,
    297 F.R.D. 283 (W.D. Ky. 2014) ......................................... 8, 25

*Ebin v. Kangadis Food Inc.*,
    297 F.R.D. 561 (S.D.N.Y. Feb. 25, 2014) ................................. 22

*Gentrup v. Renovo Servs., LLC*,
    2011 WL 2532922 (S.D. Ohio June 24, 2011) ............................ 11

*Hainey v. Parrott*,
    617 F. Supp. 2d 668 (S.D. Ohio 2007) ................................ 16, 25

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831, Dkt. 68 (E.D. Mich. Jan. 6, 2015) ............. 14, 21

*Halaburda v. Bauer Publ'g Co.*,
    No. 12-cv-12831, Dkt. 69 (E.D. Mich. Jan. 15, 2015) ................ 16

*Halliday v. Weltman, Weinber & Reis Co., L.P.A.*,
    2013 WL 692856 (E.D. Mich. Feb. 26, 2013) ........................... 10

*Harris v. comScore, Inc.*,
    No. 11-cv-05807 (N.D. Ill. 2014) ............................................. 21

*In re Cardizem CD Antitrust Litig.*,
  218 F.R.D. 508 (E.D. Mich. 2003) ...................................... 12, 16, 17, 18, 22

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
  2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) ............................... 9

*In re Facebook Privacy Litig.*,
  No. 10-cv-02389 (N.D. Cal. 2010) .............................................. 21

*In re Google Buzz Privacy Litig.*,
  2011 WL 7460099 (N.D. Cal. June 2, 2011) ............................... 15

*In re Michaels Stores Pin Pad Litig.*,
  No. 11-cv-03350 (N.D. Ill. June 8, 2011) .................................... 22

*In re Netflix Privacy Litig.*,
  2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ............................ 15

*In re Netflix Privacy Litig.*,
  No. 11-cv-00379, Dkt. 59 (N.D. Cal. Aug. 12, 2011) ................. 21

*In re Packaged Ice Antitrust Litig.*,
  2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) .......................... 18

*In re Rio Naturalizer Prods. Liab. Litig.*,
  1996 WL 780512 (E.D. Mich. Dec. 20, 1996) ....................... 16, 19

*In re Telectronics Pacing Sys., Inc.*,
  137 F. Supp. 2d 985 (S.D. Ohio 2011) ........................................ 19

*Int'l Union v. Ford Motor Co.*,
  2006 WL 1984363 (E.D. Mich. July 13, 2006) ........................... 21

*IUE-CWA v. Gen. Motors Corp.*,
  238 F.R.D. 583 (E.D. Mich. 2006) .............................................. 25

*Kogan v. AIMCO Fox Chase, L.P.*,
  193 F.R.D. 496 (E.D. Mich. 2000) .............................................. 25

*Lasalle Town Houses Coop. Ass'n v. City of Detroit*,
        2016 WL 1223354 (E.D. Mich. Mar. 29, 2016)........................................... 12

*Leonhardt v. ArvinMeritor, Inc.*,
        581 F. Supp. 2d 818 (E.D. Mich. 2008) ................................................ *passim*

*Sheick v. Auto. Component Carrier, LLC*,
        2010 WL 3070130 (E.D. Mich. Aug. 2, 2010)........................................... 25

*Sims v. Pfizer, Inc.*,
        2016 WL 772545 (E.D. Mich. Feb. 24, 2016) ........................................... 18

*Stinson v. Delta Mgmt. Assocs., Inc.*,
        302 F.R.D. 160 (S.D. Ohio 2014)......................................................... 18–19

*UAW v. Gen. Motors Corp.*,
        2006 WL 891151 (E.D. Mich. Mar. 31, 2006).............................................. 8

*Whitford v. First Nationwide Bank*,
        147 F.R.D. 135 (W.D. Ky. 1992) ............................................................. 17

## **Other Authorities**

2016 PA 92, M.C.L. § 445.1711, *et seq.* ...................................................... *passim*

Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process
        Checklist and Plain Language Guide (2010).................................................. 9

Fed. R. Civ. P. 23............................................................................................. 8, 10

House Legis. Analysis Section, H.B. No. 5331 .................................................... 17

M.C.L. § 445.1711.................................................................................................. 1

*Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B.
        5331 (Jan. 20, 1989) ...................................................................................... 4

## I.     INTRODUCTION

On June 8, 2017, this Court preliminarily approved the class action settlement between Plaintiffs Elizabeth Moeller and Nicole Brisson (the "Plaintiffs") and Defendants American Media, Inc. ("AMI") and Odyssey Magazine Publishing Group, Inc. ("Odyssey", together, "Defendants") and directed that notice be sent to the Settlement Class. (Dkt. 34.) The settlement administrator has implemented the Court-approved notice plan and direct notice has reached approximately 89.9% of the Settlement Class. The reaction from the class has been overwhelmingly positive, which should come as no surprise given that this is the largest and strongest settlement to date under Michigan's Preservation of Personal Privacy Act ("PPPA"), M.C.L. §§ 445.1711-1715. Specifically, of the approximately 334,430[2] class members, only three have requested to be excluded, there is a single pro se objection from an incarcerated individual, and tens-of-thousands have already filed claims. Those numbers effectively translate into a complete lack of opposition to the Settlement. Thus, the Court should have no hesitation in granting final approval to the Settlement.

---

[2]     The number of class members was estimated in the Settlement and Preliminary Approval Order as "approximately 415,000 Persons." (Dkts. 30-2; 34.) Defendants provided KCC, the Court-Approved Settlement Administrator, with a list of 423,237 persons, that after the duplicates were removed resulted in a list containing only 334,430 members of the Settlement Class. (Declaration of Lana Lucchesi ("Lucchesi Decl.") ¶¶ 8–9, attached as Exhibit 2.)

The settlement's strength largely speaks for itself: it creates a $7.6 million non-reversionary common fund from which class members will receive *pro rata* cash payments estimated to be around $100 (after payment of the costs of notice, administration, attorneys' fees, and incentive awards are made from the fund). The estimated $100 individual payments are 26% to 64% greater than the amounts recovered under the three other PPPA settlements that have received final approval from courts in this District. And when compared to approved settlements of cases alleging violations of similar privacy statutes—which typically offer no monetary relief to the class whatsoever—the fairness, reasonableness, and adequacy of the instant settlement becomes even more apparent. Not to be ignored, the settlement also prevents Defendants from disclosing subscribers' magazine reading choices to third parties, which was one of the primary purposes for the filing of this lawsuit.

For these reasons, and as explained further below, the Settlement is fair, reasonable, and adequate, warranting this Court's final approval.

## II.      SUMMARY OF THE LITIGATION

Plaintiffs' allegations and the events leading up to reaching the Settlement provide context for its fairness, reasonableness, and adequacy.

### A.      Plaintiffs' Allegations and the PPPA.

Defendants AMI and Odyssey are American magazine publishers whose portfolio includes popular titles such as *Country Weekly*, *Men's Fitness*, *Muscle &*

*Fitness*, *Fit Pregnancy*, *Flex*, *Muscle & Fitness Hers*, *Natural Health*, the *National Examiner*, *Shape*, *Star*, *OK!*, *Radar*, *Soap Opera Digest*, the *National Enquirer*, and *Globe*. (*See* Plaintiffs' Class Action Complaint, Dkt. 1 ["Compl."], ¶ 1.) Plaintiffs allege that Defendants don't just make money selling magazines and advertising space—they make additional profit by selling their subscribers' personal choices in reading material. (*Id*. ¶¶ 2, 24, 26—27, 62—64, 72.) And instead of simply selling lists of names that subscribe to certain magazines, Plaintiffs allege that Defendants offer for sale something far more valuable: customers' magazine reading choices along with additional data about their income levels, religion, ages, race, political affiliations, travel habits, and medical conditions. (*Id*. ¶¶ 2, 21, 27, 38, 48, 66, 72.) Defendants allegedly obtain this demographic and lifestyle data about their customers from data miners and other third parties by offering their subscriber lists in exchange for the supplemental demographic data. (*Id.* ¶ 27.)

Of course, none of this is illegal if a magazine publisher informs its subscribers about what it is doing and gets consent to disclose the information. (M.C.L. §445.1713.) The problem is, Plaintiffs allege, customers never provided consent for Defendants to disclose information to third parties related to their magazine subscriptions. (Compl. ¶¶ 3, 28, 33-36, 43-46, 68, 69.)

3

On April 14, 2016, Plaintiffs Moeller and Brisson—Michigan citizens that subscribed to Defendants' magazines—initiated this suit. (*Id.* ¶¶ 30-32; 40-42.) Both allege that at no time did they consent to allow Defendants to disclose their choice of magazine subscription to any third parties, but Defendants disclosed that information anyway. (*Id.* ¶¶ 33-36; 43-46.) They allege that this conduct violates the PPPA, which prohibits retailers, publishers, and other entities engaged in the business of selling written materials at retail from disclosing records or information "concerning the purchase . . . of those materials by a customer that indicates the identity of the customer." M.C.L. § 445.1712. The Michigan legislature rightfully recognized that a person's choice in reading materials "is nobody's business but one's own," and passed the PPPA "to explicitly protect a consumer's privacy in buying and borrowing" such materials. *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. 5331, Jan. 20, 1989. Given the importance of reader privacy, the version of the PPPA at issue here provides for statutory damages. (*See* dkt. 23 at 10-15.)

### B.     The Litigation History

Since Plaintiffs filed this case on April 14, 2016, Defendants have mounted a vigorous defense. Defendants initial attack came on June 13, 2016, when they moved to dismiss, arguing that Plaintiffs lacked standing under the Supreme Court's then-recent decision in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) and

that the 2016 amendments to the PPPA were retroactive and required dismissal.
(Dkt. 8.) When filed, both of these were complex issues of first impression, which
Plaintiffs opposed with equal vigor in a lengthy response. (Dkt. 21.)

     With the principal briefs on these dispositive issues filed, the Parties decided
to explore the potential of an early resolution before Defendants replied in support
of their motion to dismiss. (See Declaration of Rafey S. Balabanian in Support of
Plaintiffs' Motion for Final Approval of Class Action Settlement ("Balabanian
Decl.) ¶ 4, attached as Exhibit 3.) To facilitate settlement discussions, and at the
Parties' request, the Court extended the briefing schedule on the motion to dismiss,
so that the Parties could mediate with the Honorable Wayne R. Andersen, a well-
respected retired federal judge now with JAMS. (*Id.* ¶ 5.) Despite a full day of
mediation and a mediator's proposal, the Parties remained too far apart and opted
to return to litigation. (*Id.*)

     After the failed mediation, Defendants picked up where they left off, filing
their reply in support of their Motion to Dismiss. (Dkt. 21.) On January 27, 2017,
with briefing finally complete and having heard oral argument, the Court denied
Defendants' Motion to Dismiss, concluding both that Plaintiffs possessed Article
III standing and that the 2016 Amendments to the PPPA were not retroactive. (Dkt.
23.) Defendants then pushed forward, raising seventeen (17) affirmative defenses
in their Answer, including that Defendants don't sell magazines "at retail," that the

PPPA doesn't apply to magazine subscriptions, and that the PPPA violates the First Amendment. (Dkt. 24.) The Parties also put together an extensive and aggressive discovery schedule, dkt. 25, and Plaintiffs immediately propounded written discovery. (Balabanian Decl. ¶ 6.)

Continued litigation, however, was short-lived. As the case progressed, the Parties decided to re-engage Judge Andersen. (*Id.* ¶ 7.) Over the course of several weeks, Judge Andersen separately caucused with the Parties at least a dozen times (including on nights and weekends) and eventually made another mediator's proposal that was accepted by all Parties on March 28, 2017. (*Id*. ¶ 7.) The Parties then diligently prepared and executed a written settlement agreement. The Court granted preliminary approval to that Settlement on June 8, 2017. (Dkt. 34.)

## III.   TERMS OF THE SETTLEMENT AGREEMENT

The terms of the Settlement agreement are briefly summarized as follows:

### A.   Class Definition.

As part of preliminary approval, the Court certified a Settlement Class, defined as "the approximately 415,000 Persons with Michigan street addresses who purchased a subscription to an AMI Publication to be delivered to that Michigan street address between April 14, 2010 and July 31, 2016." (Dkt. 34; Agreement ¶ 1.30.)

6

### B. Monetary Relief

Defendants have established a $7.6 million non-reversionary Settlement Fund, from which each Settlement Class Member who submits a valid claim shall be entitled to a *pro rata* share, after payment of notice and administrative expenses, attorneys' fees, and any incentive award to the Class Representatives. (*Id*. ¶¶ 1.32, 2.1.) Individual payments are estimated to be approximately $100. (Balabanian Decl. ¶ 8.)

### C. Prospective Relief

For a period of four years from June 8, 2017 (the date of entry of the Court's Preliminary Approval Order), and in accordance with the Settlement Agreement, Defendants will not disclose any Michigan customers' subscription information to third-party companies without their prior express written consent. (*Id*. ¶ 2.2.)

### D. Payment of notice and settlement administration expenses.

Defendants have paid, and will continue to pay, all notice and administration expenses out of the Settlement Fund. (Agreement ¶¶ 1.28, 1.32.)

### E. Payment of incentive award, attorneys' fees, and expenses

Defendants have agreed to pay an incentive award from the Settlement Fund to Plaintiffs Moeller and Brisson in the amount of $5,000 each to compensate them for their service as Class Representatives, as well as reasonable attorneys' fees not to exceed 35% of the Settlement Fund. (*Id*. ¶¶ 1.32, 8.1, 8.3.) Both awards are

subject to this Court's approval, which Plaintiffs have moved for separately. (*See* Dkt. 37.)

### F.   Release

In exchange for the relief described above, Defendants and each of their related and affiliated entities will receive a full release of all claims arising out of or related to Defendants' disclosure of their Michigan customers' magazine subscription information. (*See* Agreement ¶¶ 1.25—1.27 for full release language.)

## IV.   THE NOTICE PLAN COMPORTS WITH DUE PROCESS.

Before final approval can be granted, Due Process and Rule 23 require that the notice provided to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). Notice "need only be reasonably calculated . . . to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." *UAW v. Gen. Motors Corp.*, 2006 WL 891151, at *33 (E.D. Mich. Mar. 31, 2006) (citation omitted). Notice must clearly state essential information regarding the settlement, including the nature of the action, terms of the settlement, and class members' options. *See* Fed. R. Civ. P. 23(c)(2)(B); *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. 283, 292 (W.D. Ky. 2014). At its core, "[a]ll that the notice must do is

fairly apprise the prospective members of the class of the terms of the proposed settlement so that class members may come to their own conclusions about whether the settlement serves their interest." *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 630 (6th Cir. 2007) (citation omitted).

That said, Due Process does not require that every class member receive notice, and a notice plan is reasonable if it reaches at least 70% of the class. *Fidel v. Farley*, 534 F.3d 508, 514 (6th Cir. 2008); Fed. Judicial Ctr., Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3 (2010); *see also In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2009 WL 5184352, at *12 (W.D. Ky. Dec. 22, 2009) (finding notice plan to be "the best notice practicable" where combination of mail and publications notice reached 81.8% of the class); *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269 (6th Cir. 2016) (finding that notice and claims processes were appropriate where 90.8% of notices were successfully delivered to addresses associated with class members). The notice plan here meets these standards, as it provided direct notice via a postcard or email to 89.9 % of the Settlement Class. (Lucchesi Decl. ¶ 14.)

At preliminary approval, the Court approved the Parties' proposed Notice Plan, finding it met the requirements of Rule 23 and Due Process. (Dkt. 34 at 9.) That plan has now been fully carried out by professional settlement administrator Kurtzman Carson Consultants, LLC ("KCC"). Pursuant to the Settlement,

Defendants provided KCC with a list of 423,237 available names, addresses and emails of potential Settlement Class Members. (Lucchesi Decl. ¶ 8.) After KCC removed duplicates, the Class List contained 334,430 potential members. KCC successfully delivered the Court-Approved notice via email to 8,255 class members and via postcard to 292,405 class members. (*Id.* ¶¶ 9–13.) Accordingly, the Court-approved notice successfully reached 89.9% of the Settlement Class. (Agreement ¶¶ 4.1(b)-(c); (Lucchesi Decl. ¶ 14.)[3] These summary notices also directed Settlement Class Members to the Settlement Website, where they were able to submit claims on-line; access important court filings, including the Motion for Attorneys' Fees; and see deadlines and answers to frequently asked questions. (Agreement ¶ 4.1(d)); (Lucchesi Decl. ¶ 16)

Given the broad reach of the notice, and the comprehensive information provided, the requirements of due process and Rule 23 are met.

## V.   THE SETTLEMENT WARRANTS FINAL APPROVAL.

The Federal Rules of Civil Procedure require judicial approval of class action settlements. *Halliday v. Weltman, Weinber & Reis Co., L.P.A.*, 2013 WL 692856, at *1 (E.D. Mich. Feb. 26, 2013) (citing Fed. R. Civ. P. 23(e)). At final approval, the ultimate issue is whether the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2); *Williams v. Vukovich*, 720 F.2d 909, 921 (6th

---

[3]     KCC also notified the appropriate state and federal officials pursuant to CAFA. (Lucchesi Decl. ¶¶ 5–7.)

Cir. 1983). Courts within the Sixth Circuit recognize a strong "federal policy favoring settlement of class actions." *UAW*, 497 F.3d at 632 (citation omitted); *see also Leonhardt v. ArvinMeritor, Inc.*, 581 F. Supp. 2d 818, 830 (E.D. Mich. 2008).

To evaluate the fairness, reasonableness, and adequacy of a settlement agreement at final approval, courts look to seven factors: (1) the likelihood of success on the merits; (2) the public interest; (3) the complexity, expense, and duration of future litigation; (4) the opinions of class counsel; (5) the amount of discovery completed; (6) the reaction of absent class members; and (7) the risk of fraud or collusion (the "*UAW* factors"). *UAW*, 497 F.3d at 631 (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)); *Williams*, 720 F.2d at 922-23. The court need only analyze the factors that are relevant to the settlement agreement and may weigh "particular factors according to the demands of the case." *Leonhardt*, 581 F. Supp. 2d at 832 (citations and internal quotations omitted). Although the factors may be assessed individually, inquiry into one factor often overlaps with another. *Gentrup v. Renovo Servs., LLC*, 2011 WL 2532922, at *3 (S.D. Ohio June 24, 2011).

As described below, each factor affirms the fairness, reasonableness, and adequacy of the Settlement, and supports final approval.

11

## A. Plaintiff's Likelihood of Success on the Merits, Balanced Against the Benefits of Settlement, Weighs in Favor of Final Approval.

The first and most important *UAW* factor requires weighing the plaintiff's likelihood of success on the merits against the immediate benefits of settlement. *Poplar Creek Dev. Co. v. Chesapeake Appalachia, LLC*, 636 F.3d 235, 245 (6th Cir. 2011); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 522-23 (E.D. Mich. 2003). "Although this inquiry understandably does not require [the court] to decide the merits of the case or resolve unsettled legal questions," the fairness of a proposed settlement cannot be judged "without weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *UAW*, 497 F.3d at 632 (citation omitted). Ultimately, the question is whether the class's interests "are better served if the litigation is resolved by the settlement." *Leonhardt*, 581 F. Supp. 2d at 832-33, 836 (citation omitted) ("absent settlement, all class members would be subject to the uncertainty, risk, hardship and delay attendant to continued litigation which ultimately might leave them with absolutely nothing."); *see also Lasalle Town Houses Coop. Ass'n v. City of Detroit*, 2016 1223354, at *6 (E.D. Mich. Mar. 29, 2016) (granting final approval where "class members would bear the risk of continued litigation with the potential for an adverse result."). The likelihood that Plaintiffs will succeed on the merits thus serves as a "gauge" against which the benefits of the settlement are measured.

*Poplar Creek*, 636 F.3d at 245 (citing *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075 (6th Cir. 1984)).

Here, Plaintiffs believed that their chances of succeeding in certifying an adversarial class and prevailing on summary judgment or at trial were strong, but they were also far from certain. (Balabanian Decl. ¶ 9.) Plaintiffs had defeated Defendants' two main case-dispositive arguments—lack of Article III standing and retroactivity of the PPPA—and the uniformity of Defendants' conduct toward the class made the case an ideal candidate for certification. *See Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524 (E.D. Mich. 2015) (certifying class where defendant engaged in similar conduct toward its magazine subscribers).

That said, there remained several ways in which the class could wind up empty-handed. Plaintiffs would still face challenges on the merits of Defendants' 17 affirmative defenses as well as issues at summary judgment, including whether Defendants were selling their subscriptions "at retail." (Balabanian Decl. ¶ 10.) While Plaintiffs believe that they would have succeeded on those issues, the Sixth Circuit in *Coulter-Owens v. Time Inc.*, 2017 WL 2731309 (6th Cir. June 26, 2017) would have made succeeding on the "at retail" issue more difficult.[4] There, the Court found in an unpublished decision that under the facts of that case, the subscribers who purchased their magazine subscriptions through third-party online

---

[4] Although *Coulter-Owens* may have complicated summary judgment issues here, it forecloses further argument on either the Article III or retroactivity issues.

subscription agents did not purchase "at retail," as required by the PPPA. *Id*. at *6.

The Settlement in this case was reached approximately 3 months prior to the Sixth

Circuit's opinion, which certainly would have altered the course of the litigation

and may have even ultimately barred recovery to members of the Settlement Class

who subscribed to Defendants' publications through third parties. (Balabanian

Decl. ¶ 10.)

Against this backdrop of uncertainty, the benefits of the Settlement are

obvious and unmistakable: it creates a larger settlement fund for fewer class

members resulting in higher per class member recovery compared to the other

three PPPA settlements that have been approved in this district. (*Id.* ¶ 11.)

Specifically, the $7.6 million settlement fund for the benefit of 334,430 potential

class members is not only itself larger, but the anticipated $100 per person is one to

two times the individual recovery provided for in other PPPA settlements. *See*

*Halaburda*, No. 12-cv-12831, dkt. 68 (securing a $775,000 fund for a class of

40,000 subscribers with claiming class members getting an estimated $74 *pro rata*

payment); *Coulter-Owens v. Rodale*, No. 14-cv-12688 dkt. 54 (securing a $4.5

million fund for a class of approximately 580,000 subscribers with claiming class

members getting an estimated $44 *pro rata* payment); *Kinder*, No. 13-cv-11284

dkt. 81(securing a $7.5 million fund for a class of approximately 980,000

subscribers with claiming class members getting an estimated $50 *pro rata* payment).

The reasonableness of the anticipated $100 *pro rata* payments becomes all the more apparent when looking at the relief afforded in the typical privacy settlement, where classes tend to be enormous, but individual class members receive only *cy pres* relief without any individual payments. *See, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 820-22 (9th Cir. 2012) (affirming $9.5 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in class of millions), *cert. denied* 134 U.S. 8 (Nov. 4, 2013); *In re Google Buzz Privacy Litig.*, No. C 10-00672 JW, 2011 WL 7460099, at *3-5 (N.D. Cal. June 2, 2011) (approving $8.5 settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of up to $10,000 per claim were available in a class of millions); *In re Netflix Privacy Litig.*, No. 11-cv-00379, 2013 WL 1120801, at *6-7 (N.D. Cal. Mar. 18, 2013) (approving $9 million settlement providing *cy pres* payment as sole monetary relief in case where statutory damages of $2,500 per claim were available to class of millions).

Often overshadowed, but just as important, the Settlement delivers meaningful prospective relief. For the next four years Defendants will not disclose their Michigan customers' subscriber information to third parties without prior

express written consent. (Agreement ¶ 2.2(a).) This relief aligns perfectly with both the goals of the PPPA and those of this lawsuit. *See, e.g.*, *Halaburda v. Bauer Publ'g Co.*, No. 12-cv-12831, Dkt. 69 (E.D. Mich. Jan. 15, 2015) (finally approving a class action in similar PPPA litigation and finding that "the more important provisions of the settlement agreement are the provisions according equitable relief and a cessation of the disclosure altogether for this period of four years by the defendants."). This prospective relief is particularly significant here, given that the 2016 amendments to the PPPA no longer prohibit disclosure of such information when it is "incident to the ordinary course of business" of the person disclosing the information. 2016 Mich. Pub. Acts 92, M.C.L. § 445.1713.

Where, as in this case, Plaintiffs' likelihood of success on the merits is tempered by uncertainty, the benefits of the settlement—both the prospective and monetary—are readily apparent. The first *UAW* factor thus supports final approval.

**B.    In Protecting Reader Privacy and Conserving Judicial Resources, the Settlement Serves the Public Interest.**

A settlement that serves the public interest is likely to be found fair, reasonable, and adequate. *In re Cardizem*, 218 F.R.D. at 530. Settlements may serve the public interest by advancing a statute's goals or by conserving judicial resources. *See id.*; *see also In re Rio Hair Naturalizer Prods. Liab. Litig.*, 1996 WL 780512, at *12 (E.D. Mich. Dec. 20, 1996) ("Voluntary resolution [of complex class action litigation] is in the public interest"); *Hainey v. Parrott*, 617 F. Supp. 2d

16

668, 679 (S.D. Ohio 2007) ("Public policy generally favors settlement of class action lawsuits") (citing *Whitford v. First Nationwide Bank*, 147 F.R.D. 135, 143 (W.D. Ky. 1992)). To serve the public interest, a settlement agreement that seeks to enforce a statute "must be consistent with the public objectives" that the legislature sought to attain. *Williams*, 720 F.2d at 923 (citations omitted).

The instant Settlement furthers the objectives sought by the Michigan Legislature when it enacted the Statute years ago. The PPPA recognizes that "one's choice in videos, records, and books is nobody's business but one's own." House Legis. Analysis Section, H.B. No. 5331. At its core, the PPPA protects Plaintiffs' "right to read or observe what [they] please—the right to satisfy [their] intellectual and emotional needs in the privacy of [their] own home." *Stanley v. Georgia*, 394 U.S. 557, 565 (1969). Thus, the Settlement serves the legislature's goal of protecting an individual's right to privacy in the written materials he or she chooses to read because it prevents the disclosure of magazine reading preferences by Defendants without express consent. (*See* Agreement ¶ 2.2.)

It also advances the public interest by conserving judicial resources, avoiding "notoriously difficult and unpredictable" class action litigation that can consume the court's time and money. *See In re Cardizem*, 218 F.R.D. at 530; *see also Leonhardt*, 581 F. Supp. 2d at 839. To be sure, if the Settlement does not receive the Court's final approval, the case's complex and lengthy litigation would

continue and would require significantly more motion practice and potential appeals. *See Sims v. Pfizer, Inc.*, 2016 WL 772545, at *9 (E.D. Mich. Feb. 24, 2016) (finally approving settlement and finding that "absent settlement, all class members would be subject to the uncertainties, hardship, and delay attendant to continued litigation."). Here, there is no need to deviate from the "strong public interest in encouraging settlement of complex class action litigation." *See In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *15 (E.D. Mich. Dec. 13, 2011) (citation omitted).

The Settlement serves the public interest because it furthers the underlying purpose of the PPPA—to protect the privacy of consumers' personal reading habits—and conserves judicial resources. The second factor therefore weighs in favor of final approval.

### C. The Complexity, Expense, and Duration of Further Litigation Favor Final Approval.

The third *UAW* factor requires the consideration of the complexity, expense, and duration of further litigation, and the comparison of those risks to the relief afforded under the settlement. *See, e.g., In re Cardizem*, 218 F.R.D. at 523; *UAW*, 2006 WL 891151, at *18 (citation omitted). Final approval is favored in cases such as this one, where the parties are "likely [to] expend significant time and money litigating [a] case through class certification, dispositive motions, trial, and appeal," further chipping away at the amount—and possibility—of class recovery.

18

*Stinson v. Delta Mgmt. Assocs., Inc.*, 302 F.R.D. 160, 164 (S.D. Ohio 2014); *see also In re Telectronics Pacing Sys., Inc.*, 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001) (citation omitted).

Undoubtedly, further litigation in this case would produce substantially more motion practice, including an adversarial motion for class certification, discovery disputes, and motions for summary judgment. Absent a summary judgment victory, such a hard-fought case would ultimately lead to a trial, thus guaranteeing that the matter would not conclude any time in the near future. Whichever party loses, either at summary judgment or trial, will certainly appeal. Any one of these obstacles could strip the class of all recovery, making further litigation "a high stakes 'zero sum' undertaking." *Leonhardt*, 581 F. Supp. 2d at 833.

Absent final approval of the instant Settlement, the complexity, expense, and duration of further litigation will threaten a positive outcome for the class. Accordingly, the third *UAW* factor supports final approval.

### D.   The Stage of the Proceedings and Amount of Discovery Completed Weigh in Favor of Final Approval.

The fourth *UAW* factor examines the stage of the proceedings and the amount of discovery that has taken place. *In re Rio*, 1996 WL 780512, at *13. Although "[t]here is no precise yardstick to measure the amount of litigation that the parties should conduct before settling," the case should be developed enough to raise the court's decision "above mere conjecture." *Id.* (citation and internal

quotations omitted). What is imperative is not the amount of formal discovery completed, but whether the parties and the court have sufficient information to make a reasoned decision with respect to settlement. *See IUE-CWA v. Gen. Motors Corp.*, 238 F.R.D. 583, 598 (E.D. Mich. 2006) ("That the parties conducted their investigation through informal discovery . . . is not unusual or problematic, so long as they and the court have adequate information in order to evaluate the parties' relative positions.").

Here, in preparation for the initial mediation and further negotiations with Judge Andersen, Plaintiffs obtained informal discovery from Defendants regarding the size of the class and the nature of the disclosures. (Balabanian Decl. ¶ 12.) Armed with this information and the knowledge acquired from having litigated and settled other PPPA class actions, Plaintiffs and their counsel had all the information they needed to reach an informed resolution of this matter. (*Id.*) As such, the fourth *UAW* factor also militates in favor of final approval.

### E.    The Opinion of Class Counsel Supports Final Approval.

The fifth *UAW* factor assesses the opinion of experienced counsel regarding the settlement. *UAW*, 497 F.3d at 631; *Williams*, 720 F.2d at 922-23 ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs."). Counsel's judgment is entitled to significant weight. *Leonhardt*, 581 F. Supp. 2d at 837. The deference afforded to counsel's

opinion depends on both their skill and experience, *Int'l Union v. Ford Motor Co.*, 2006 WL 198463, at *25 (E.D. Mich. July 13, 2006), as well as "the amount of discovery completed and the character of the evidence uncovered." *Williams*, 720 F.2d at 923.

Here, Class Counsel are well-respected attorneys with significant experience litigating consumer class actions of similar size, scope, and complexity. (Balabanian Decl. ¶ 13; *see also* Firm Resumes of Edelson PC and Bursor & Fisher, P.A., which are attached to the Balabanian Decl. as Exhibits 3-A and 3-B.) In addition to being at the forefront of PPPA litigation, *see, e.g., Halaburda*, No. 12-cv-12831, dkt. 68, Edelson PC is widely known for its work in the area of consumer privacy litigation. *See, e.g., In re Facebook Privacy Litig.*, No. 10-cv-02389, dkt. 69 (N.D. Cal. 2010) (recognizing Edelson PC as "pioneers in the electronic privacy class action field"); *see also In re Netflix Privacy Litig.*, No. 11-cv-00379, dkt. 59 (N.D. Cal. Aug. 12, 2011) (noting Edelson PC's "significant and particularly specialized expertise in electronic privacy litigation and class actions"); *see also Harris v. comScore*, No. 11-cv-05807, dkt. 369 (N.D. Ill. 2014) (granting final approval to one of the largest consumer class actions ever brought under federal electronic privacy laws, in which Edelson PC served as sole lead counsel); *see also Coulter-Owens v. Rodale, Inc.*, No. 14-cv-12688 (E.D. Mich.

Sep. 29, 2016) (appointing as class counsel attorneys from Edelson PC in a similar PPPA class action that settled on comparable terms).

The law firm of Bursor & Fisher, P.A., has also been recognized for the efforts it has made on behalf of consumer classes. *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. Feb. 25, 2014) ("Bursor & Fisher, P.A., are class action lawyers who have experience litigating consumer claims. … The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five class action jury trials since 2008."); *In re Michaels Stores Pin Pad Litig.*, No. 11-cv-03350, dkt. 22 (N.D. Ill. June 8, 2011) (appointing Bursor & Fisher class counsel to represent a putative nationwide class of consumers who made in-store purchases at Michaels using a debit or credit card and had their private financial information stolen as a result).

Class Counsel believe that the Settlement is fair, reasonable, and adequate. (Balabanian Decl. ¶ 16.) In light of their experience, their opinion in support of final approval satisfies this *UAW* factor.

### F.     The Reaction of Absent Class Members Favors Final Approval

The sixth *UAW* factor weighs in favor of approval where the majority of class members have elected to remain in the settlement class without objecting. *In re Cardizem*, 218 F.R.D. at 527. A small number of opt-outs and objections "are to be expected in a class action" and do not impact the Settlement's fairness. *Id.*

(citations omitted); *see also Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (inferring that most "class members had no qualms" with settlement where 29 out of 11,000 class members objected). Here, over 39,000 people have already filed claim forms, a single pro-se individual has objected to the Settlement, and only 5 have opted out (a mere .0007% of the Settlement Class). (Lucchesi Decl. ¶ 17–19.) This exceptional participation rate and lack of opposition to the Settlement Class leave no question that the class members view the Settlement favorably, which further underscores its fairness. *See Hillson v. Kelly Servs. Inc.*, No. 2:15-CV-10803, 2017 WL 3446596, at *2 (E.D. Mich. Aug. 11, 2017) (finding that 10 opt-outs and a single objection that did not question the fairness of the settlement to the class "strongly indicates that the settlement is fair.")

Further, the lone objection from Ms. Peterson, an incarcerated individual serving multiple life sentences, misunderstands the nature of the disclosures of personal information at issue in this case and should be overruled.[5] (Balabanian Decl. ¶ 17.) As an initial matter, Ms. Peterson's objection references her subscription to magazines that are not even published by Defendants. (*Id.*) But even assuming she did subscribe to one of Defendants' publications during the class period, Ms. Peterson's objection should still be overruled. First, Ms. Peterson

---

[5] Ms. Peterson also claims that her brother called Class Counsel and that those calls went unanswered. This assertion is false. Class Counsel logs every call it receives about every settlement and none referenced Ms. Peterson or any other incarcerated person. (Balabanian Decl. ¶ 17.)

wrongly believes that the prospective relief is not a benefit to her because she's imprisoned. (*Id.* ¶ 17(a).) Not so. Ms. Peterson's reading choices will be protected from disclosure to third parties absent her consent just like every other class member—a protection they currently don't receive under the amended PPPA. (*Id.* ¶ 17(b).) Next, Ms. Peterson suggests that the settlement should have provided credit monitoring protection for victims of identity theft. This critique stems from an IRS notice she received after two tax returns were filed in her name in 2010. But the information that the IRS explained would have been used to perpetrate the fraud—i.e., Ms. Peterson's "Social Security number (SSN) or Individual Taxpayer Identification Number (ITIN)"—is not the sort of information collected and disclosed by magazine companies. (*Id.*) Thus, Ms. Peterson's belief that Defendants' disclosures resulted in the IRS notice she received and her resulting request for credit monitoring is mistaken. Finally, Ms. Peterson appears to object to the amount individuals are anticipated to receive under the settlement, but for the reasons explained above, the monetary result here exceeds most privacy settlements, including those under the PPPA. (*Id.* ¶ 17(c).)

Accordingly, Ms. Peterson's objection should be overruled and the Court should find that this factor likewise favors granting final approval.

### G.   The Settlement is Free from Fraud and Collusion.

The final *UAW* factor ensures that the settlement is the "product of arm's-length negotiations as opposed to collusive bargaining." *Kogan v. AIMCO Fox Chase, L.P.*, 193 F.R.D. 496, 501-02 (E.D. Mich. 2000) (citations omitted); *see also Sheick v. Auto. Component Carrier, LLC*, 2010 WL 3070130, at *13 (E.D. Mich. Aug. 2, 2010) (explaining that arm's-length negotiations conducted "by adversarial parties and experience counsel" are indicative of a settlement's fairness, reasonableness, and adequacy.) The absence of fraud or collusion is presumed unless there is evidence to the contrary. *IUE-CWA*, 238 F.R.D. at 598; *see also UAW*, 497 F.3d at 628; *Dick v. Sprint Commc'ns Co. L.P.*, 297 F.R.D. at 295 (recognizing that courts "presume the absence of fraud or collusion in class action settlements" and finding that the exchange of data through litigation and the absence of allegations of fraud or collusion indicated that the settlement was the result of a good-faith negotiation) (quoting *Leonhardt*, 581 F. Supp. 2d at 838). Finally, "[t]he participation of an independent mediator in the settlement negotiations virtually insures that the negotiations were conducted at arm's-length and without collusion between the parties." *Hainey*, 617 F. Supp. 2d at 673.

This Settlement is the product of negotiations conducted at arm's-length by experienced counsel representing adversarial parties and there is absolutely no evidence of fraud or collusion. (Balabanian Decl. ¶ 18.) As the docket in this case

reflects, the parties have vigorously pursued their own interests and positions throughout the litigation, (*see*, *e.g.*, dkts. 8, 12, 21), further confirming the absence of fraud or collusion. *See Leonhardt*, 581 F. Supp. 2d at 838; Balabanian Decl. ¶ 18.) And when the Parties were finally ready to discuss the possibility of settlement, all of their negotiations occurred only at arm's-length through a former federal judge acting as a mediator. In fact, not only did the first mediation fail, but the settlement was only reached as a result of a proposal by Judge Andersen. (Balabanian Decl. ¶ 18.)

The arm's-length nature of these negotiations is not altered by the fact that the Settlement permits the Court to award each Plaintiff a modest $5,000 service award to compensate them for the approximately 25 hours of service they provided to ensure the class they represented obtained meaningful relief. (*See* Dkt. 37.) As explained in detail in Plaintiffs' request for a service award, here, an incentive award of $5,000 each is not a bounty or a windfall, and is in fact reasonable to compensate Plaintiffs for the significant amount of time they invested in obtaining a $7.6 million common fund for the class. (*Id.* at 26-27, discussing *In re Pampers Dry Max Litig.*, 724 F.3d 713 (6th Cir. 2013) and Plaintiffs' substantial service throughout this litigation).) Modest service awards—like the one sought here—are routinely approved in this District and do not create either an adequacy issue nor

indicate collusion when, as here, the award compensates for time spent and the class is obtaining real relief. (*Id.*)

There should be no question that the Settlement is entirely free from fraud or collusion and the final *UAW* factor supports granting final approval.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (i) granting final approval to the Settlement Agreement, and (ii) overruling Ms. Peterson's objection, and (iii) awarding such other and further relief as the Court deems reasonable and just.

Dated: August 23, 2017                    Respectfully submitted,

**ELIZABETH MOELLER AND NICOLE BRISSON**, individually and on behalf of the settlement class,

By: /s/ Rafey S. Balabanian
One of Plaintiffs' Attorneys

Jay Edelson
jedelson@edelson.com
Rafey S. Balabanian
rbalabanian@edelson.com
Ari J. Scharg
ascharg@edelson.com
Eve-Lynn Rapp
erapp@edelson.com
Benjamin S. Thomassen
bthomassen@edelson.com

EDELSON PC

350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Henry M. Scharg
hmsattyatlaw@aol.com
LAW OFFICE OF HENRY M. SCHARG
718 Ford Building
Detroit, Michigan 48226
Tel: (248) 596.1111
Fax: (248) 671.0335

Scott A. Bursor
scott@bursor.com
Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, PA
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

*Counsel for the Plaintiffs and the
Settlement Class*

**CERTIFICATE OF SERVICE**

I, Rafey S. Balabanian, an attorney, hereby certify that on August 23, 2017, I served the above and foregoing document on all counsel of record by filing it electronically with the Clerk of the Court using the CM/ECF system.


/s/ Rafey S. Balabanian